UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
JAMES ANDERSON,

                  Petitioner,

        -against-

MARK L. BRADT, Superintendent,

                  Respondent.

-------------------------------------------------------x

**MEMORANDUM & ORDER**

13 CV 4502 (RJD)

DEARIE, District Judge.

      Holding his victim at gunpoint, petitioner James Anderson stole the man's wallet, cellphone, and an additional $500 that he had the man withdraw from a nearby ATM. As a result of this conduct, after a jury trial at which he represented himself, petitioner was convicted of robbery in the second degree and unlawful imprisonment in the second degree. Found to be a persistent violent felony offender, petitioner was sentenced to a term of twenty-five years to life.

      Following the affirmance of his conviction on direct appeal, People v. Anderson , 94 A.D.3d 1010 (2d Dep't), lv. denied, 19 N.Y.3d 956 (2012) and the denial of state postconviction relief, People v. Anderson, Ind. No. 2085-2008 (Cty. Ct. Suffolk Co. June 29, 2012), lv. denied, No. 2012-07168 (Jan. 9, 2013), petitioner now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Five of his seven claims advance interrelated allegations of prosecutorial misconduct or ineffective assistance of counsel delineated more specifically below in the context of the facts to which they relate. He also claims that the trial court did not make an adequate inquiry before granting his request to represent himself and that the evidence at trial was legally insufficient.

      For the reasons set forth below, the application for habeas relief is denied.

## FACTUAL BACKGROUND

A.    The Crime: Overview

At approximately 3:00 a.m. on July 27, 2008, Kenneth Davis drove to the "park and ride" rest area near exit 52 on the Long Island Expressway in Brentwood. In search of a sexual partner, he approached a man sitting on a bench who identified himself as "T," eventually identified in a post-lineup photo array and at trial as petitioner.[1] Petitioner entered Davis's car, and together they went to the nearby Olympic Motel; petitioner waited in the car while Davis rented a room, paying in cash. Petitioner then suggested buying condoms, so Davis drove them to the nearby Shell gas station. Davis gave petitioner $15 and waited in the car. Petitioner returned with condoms, a snack cake and an energy drink, and Davis drove them back to the motel.

Inside the room, petitioner pulled out a black and silver handgun, locked the door, forced Davis to disrobe, then took his cellphone and the contents of his wallet. Agitated because Davis did not have much cash, petitioner had Davis dress (except for his shoes and socks) and, still at gunpoint, drive to a nearby ATM for more money. In the car petitioner said that his girlfriend gave him AIDS, that he had been in and out of prison often, and that he had nothing to live for.

At the ATM—a drive-through at a nearby Teachers Federal Credit Union ("TFCU")— petitioner gave Davis back his ATM card, and Davis withdrew $500, dispensed in fifty-dollar bills, and gave it to petitioner. At petitioner's continued direction Davis drove to a nearby side

---

[1] The lineup was not conclusive because petitioner would not lift his head. Davis eliminated all other participants as the man who had robbed him but could neither identify nor eliminate petitioner.

street, where petitioner exited, threatening to kill Davis's mother if he reported what had happened. Davis returned to the motel, retrieved his shoes, checked out, and then went home.[2]

Davis's account of these events was corroborated by, inter alia, records from the Olympic Motel confirming that he had rented a room at the time he claimed[3]; surveillance footage (video and stills) from the Shell gas station showing petitioner inside the store making the purchases described; a Shell gas station receipt for the purchase of condoms, a snack cake and an energy drink at the relevant time; and TFCU records confirming the $500 withdrawal dispensed in fifty-dollar bills.

B.    The ATM Surveillance Footage

Davis's cash withdrawal was captured on video surveillance but the footage was not introduced at trial. Instead, investigating Detective Dennis Murphy testified to its contents:

> We went inside, we asked to speak to the branch manager, who was working. We were taken to his office. We asked about the video from earlier that Sunday . . . He downloaded it, or showed it to us on his computer. We were just able to see the SUV pull up, the subject that appeared to look like our victim, we saw him use the ATM machine. We exam --- it was dark. The picture was a little grainy, but we could make out [the] left leg.
>
> . . . We could just make out the leg of the passenger in the car. We couldn't see a face or anything like that.

---

[2] Davis did not initially report the incident to the police because he feared that disclosure of his sexuality would destroy his relationship with his mother, an evangelical preacher, and with the church where was he was an organist and music trustee. Davis phoned 911 at his mother's insistence, however, after she overheard him on the telephone cancelling his stolen credit cards. Davis was not entirely truthful with the 911 operator because his mother was listening in on the call and, again due to his mother's presence, withheld part of the story when he first spoke with police.

[3] The room was cleaned and re-rented before the police arrived and, in any event, Davis testified that petitioner wiped down the surfaces he had touched before the two men left for the bank.

The bank would not release the tape to Murphy, however, because he did not have a subpoena. Bank representatives testified that the bank never received a subpoena, and that the surveillance equipment typically records over earlier footage every 40 to 45 days. The state did not further explain the absence of the surveillance tape at trial, and in summation conceded that investigators had "made a mistake" in failing to secure it. A bank representative, corroborating Detective Murphy in part, testified that the quality of the ATM's surveillance footage would typically be "grainy" and that only a portion of a front-seat passenger would typically be visible.[4]

Petitioner capitalized upon the absence of ATM surveillance footage by arguing to the jury that the film "in all reality, could have vindicated [him] from even standing in this trial, because viewing this film, would have eliminated [him] as being a suspect."

C.    Circumstances of Petitioner's Arrest

Petitioner was stopped two days later, in the early morning hours, as a suspect in an unrelated attempted burglary. Officer Brendan Costello and his partner spotted him walking along the LIE service road and directed their vehicle's spotlight at him. Petitioner tossed one of the two knapsacks he was carrying and kept walking. The police asked why he threw the bag and he replied, "What bag?" Officer Costello then examined the bag while his partner made pedigree inquiries. Told that the police were investigating an attempted burglary, petitioner responded, "Burglaries, I'm not down with burglaries. Robberies is where the money's at." Costello frisked the tossed bag, felt a hard object he suspected was a firearm, opened the bag, and found what he thought was a silver-and-black pistol; after removing the clip it turned out to

---

[4] Petitioner objected to this portion of Murphy's testimony on the ground that the footage no longer existed. The trial court overruled the objection, stating that Murphy "can testify to something that he has seen or not seen."

4

be a BB gun.

Petitioner was arrested and charged with seventh degree drug possession in connection with a crack pipe also found in his bag that he admitted using, was then eliminated as a suspect in the home invasion, and was soon transferred to the precinct handling the Davis robbery because he matched the description of the suspect in that case.[5]  In the car ride over, petitioner said, "I'm HIV positive.  It doesn't matter."

D.    Defense Counsel's Opening Statement and
       Petitioner's Request to Represent Himself

Daniel Barker of Suffolk County Legal Aid represented petitioner during the pre-trial phase of the case and then at trial through only jury selection, opening statements and the first witness.  His opening posited a version of events consistent with petitioner's position pre-trial, namely, that while the park and ride encounter was voluntary, its objective was the brokering of a drug deal.  Davis went willingly to the ATM, according to this narrative, to get the cash that petitioner, who knew a seller, would use to make a crack purchase on Davis's behalf.

Drawing jurors' attention to the absent bank surveillance footage, counsel argued: "if you were able to see that video, you'd see two people in a car voluntarily at a drive through ATM machine."  He also described the surveillance footage as the "missing crucial evidence that would acquit."

After the first witness testified, petitioner addressed the court, expressing his dissatisfaction with this portion of counsel's opening.  He told the court (Suffolk County Court

---

[5] Davis described the man who robbed him as a dark-skinned black man, slightly scruffy, approximately 6'1" and 190 pounds, wearing black pants, a black long-sleeved shirt, a dark colored Yankee cap, and black sneakers.

Judge Gary J. Weber) that he felt his lawyer had substantially prejudiced him in that, "[his] lawyer just put [him] at a scene of a crime that [he] didn't do." He added: "In my statement, when I made my . . . pretrial hearing, I told you what was going on. I never went to that bank."

A lengthy colloquy ensued, and petitioner then asked, "Then can I represent myself? I'd rather do it myself if that's the case." Judge Weber initially advised, "I don't think you should represent yourself." Petitioner insisted, "It's not what you think, your Honor. It's what I think. This is my life, right?" Judge Weber recommended that petitioner "go back and think about it." Petitioner replied, "I don't have to think about it [any] more. I want to do it myself." The court nevertheless adjourned, advising petitioner to "think about it overnight."

The following day, petitioner resumed his debate with the court about the significance of counsel's "concession" in the context of the facts.[6] Judge Weber reiterated that he "c[ould] not see how Mr. Barker ha[d] done anything other than present a set of facts that is consistent with [petitioner's] hearing contentions," but acknowledged to petitioner that "[y]esterday, [he] correctly stated that this is [his] life and [he does] have the right to represent [him]self." Judge Weber further stated: "I have had an opportunity to listen to you testify at the pre-trial hearings. I have listened to you speak at various times. You have significant personal experience with the

_____

[6] Inter alia, Judge Weber explained that counsel's opening was consistent with a sound trial strategy of preparing for the possibility that surveillance footage placing him at the ATM might emerge during trial, whereas petitioner insisted that the absence of any such footage was, by then, an established fact. Judge Weber also explained that, in any event, the case was "not [one] of misidentification" but of "what happened between [petitioner] and [Davis]." The court also posited to petitioner that, "[b]eing together with [Davis] at the gas station and at the ATM does not mean that you robbed [him]," and that "a [joint] trip to the ATM to obtain money prior to the sale of drugs is, in fact, more consistent [with his defense] than the contention that [Davis] went alone to the ATM."

New York State Criminal Justice System such that the courtroom is not unfamiliar to you. You also present yourself as articulate and intelligent." Judge Weber also explained to petitioner that "[t]rials have many rules that must be enforced" against "both parties," summarized Mr. Barker's education and experience, and urged that "it would seem to be in [petitioner's] best interest to take advantage" of that experience. In conclusion, Judge Weber told petitioner, "You've had some time last night to think about what is going on with this case. Take a few moments and think about whether you want to represent yourself or let Mr. Barker proceed . . . that's what you [have] to decide."

Petitioner reiterated his complaint that counsel's opening had placed him at the scene, asked "first and foremost" for a mistrial, insisted again that he did not go with Davis to the bank, and then stated that "unless [he was] granted a mistrial, [he] would like to represent [him]self," but added that he wanted to "keep Mr. Barker on as [his] second chair." Petitioner continued: "honestly, no one knows this case better than myself because I actually lived it and . . . it would enable me to put forth, I believe, the best possible defense in my behalf." Judge Weber then asked again, "So, you want to be your own lawyer?" and petitioner replied, "Yeah, I would take the lead chair in my defense." Judge Weber remarked, "I don't know what you mean by lead chair," and petitioner replied, "I'll be my lawyer." After another round of debate driven by petitioner's insistence that he did not accompany Davis to the ATM, Judge Weber brought the discussion back to petitioner's request: "Look. All I can take care of it what's on the table. . . The first thing is, if you insist on being your own lawyer, I'll let you do it. Mr. Barker will be your advisor. As far as the mistrial is concerned, I'm not going to do that . . . So there we are." The jury then entered the courtroom.

Mid-trial, during petitioner's cross-examination of Officer Costello, Judge Weber urged petitioner to "strongly consider putting Mr. Barker back in charge" because he believed matters were getting "unwieldly" but petitioner was adamant in his refusal. In particular, he told the court that he "prefer[red] to ask the[] questions because . . . [he] lived [it]" and that "[w]ithout him having to take the stand, the jury will hear what went on that night." Judge Weber reiterated that petitioner was "not helping [him]self so far" and would be better served by his attorney, but petitioner's reply was, "my lawyer doesn't serve the fifteen years[,] does he?"

Once permitted to proceed *pro se*, petitioner did not once voice a change of heart about his choice, and Mr. Barker served as standby counsel throughout the proceeding.

## DISCUSSION

**GENERAL HABEAS STANDARDS**

The extraordinary remedy of habeas corpus is available only when a prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Under the Antiterrorism and Death Penalty Act of 1996 ("AEDPA), a federal court "shall not" issue the writ on the basis of a claim "adjudicated on the merits" in state court "unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Intended to "erect[] a formidable barrier to federal habeas relief," Burt v. Titlow, __ U.S.__, 134 S. Ct. 10, 16 (2013), these standards have been strictly construed. A state court decision is "'contrary to' clearly established federal law if the state court applies a rule different

8

from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." Chrysler v. Guiney, __ F.3d__, 2015 WL 7292149, at *10 (2d Cir. Nov. 19, 2015) (internal quotation and citation omitted). An "unreasonable application" of clearly established federal law occurs when "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 102 (2011). For fact-based challenges, the habeas petitioner bears the additional burden of rebutting the state court's factual findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The Supreme Court has made clear that "[i]f this standard is difficult to meet, that is because it was meant to be," Harrington, 562 U.S. at 102, and reaffirmed that habeas courts "will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." Titlow, 134 S.Ct. at 16 (internal quotations, citations and alterations omitted).

**ANALYSIS OF PETITIONER'S CLAIMS**

**A.      The Prosecutorial Misconduct Claims**

**1.      The Suborning of Perjury from Detective Murphy (Ground 4 in the Petition)**

Petitioner claims here, as he did on direct appeal, that Detective Murphy's trial testimony about the ATM footage was false because at the pre-trial hearing Murphy testified that he did *not* view ATM surveillance footage, or at least not on the day he first went to the bank.[7] The

---

[7] The relevant pre-trial testimony is the following:

Q.      Did you look at any photos or any video from [TFCU]?
A.      No, we did not.

Appellate Division rejected the claim as one of petitioner's "remaining contentions" that it found to be "without merit," Anderson, 94 A.D.3d at 1014, a disposition that counts as an adjudication on the merits for purposes of § 2254. Harrington, 562 U.S. at 99-100.

The Appellate Division did not misapply federal law, see, e.g., Napue v. Illinois, 360 U.S. 264 (1959) (conviction obtained by knowing use of false testimony is fundamentally unfair), because petitioner's claim does not involve a federal question. At trial, petitioner questioned Murphy on the subject of his prior testimony and Murphy explained: "To the best of my memory I did testify at a previous hearing that I didn't recall seeing the video . . . I spoke to my partner and my partner refreshed my memory and I did recall that we did see this little piece of the video." Also admitted in evidence through Murphy was a bank manager's business card furnished during that visit, on the back of which Murphy's partner jotted the notation, "Transaction info, 7/27/08, 04:24 hours," denoting the portion of the surveillance video viewed.

Petitioner has miscast his claim as one for perjury, for there is nothing in the record to suggest that wrongdoing of that nature occurred. The sole question presented by the discrepancies in Murphy's testimony is one of witness credibility, which it was the province of the jury to resolve. See Cavazos v. Smith, __ U.S. __, 132 S. Ct. 2, 3-4 (2011) (per curiam) ("The opinion of the Court in *Jackson v. Virginia,* [443 U.S. 307 (1979] makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.").

---

Q.    You never looked at any?
A.    Not that day.  We were told a subpoena would be needed to do that.
Q.    And you're not aware of any subpoena ever [sic]?
A.    I believe there was a subpoena later issued.

**2.     Prosecutorial Misconduct and
        Destruction of *Brady* Material (Ground 3 in the Petition)**

Relatedly, petitioner alleges that the prosecution engaged in misconduct by failing to

timely subpoena the ATM surveillance footage.  He also claims that the video was exculpatory

and therefore <u>Brady</u> material.

Petitioner presented this claim in his principal brief to the Appellate Division, which

rejected it as another of his "remaining contentions" that it found to be "without merit."

<u>Anderson</u>, 94 A.D.3d at 1014.

<u>Arizona v. Youngblood</u>, 488 U.S. 51(1988), "hold[s] that unless a criminal defendant can

show bad faith on the part of the police, failure to preserve potentially useful evidence does not

constitute a denial of due process of law."  <u>Id.</u> at 58.  The state appellate court did not contravene

or misapply <u>Youngblood</u>, or unreasonably construe the factual record, in concluding that the

requisite bad faith on the part of law enforcement was not present here.  Although the tale of the

missing footage could perhaps have been more fully told, the prosecutor did concede in

summation that a mistake was made.  In any event, petitioner cannot show prejudice because

Murphy's testimony about the surveillance footage corroborated no more than Davis's presence.

Murphy did not testify that he also saw a gun on the tape nor did he opine that the partially

visible passenger was petitioner,[8] and the prosecutor, in summation, appropriately refrained from

asking the jury to draw that inference.

The component of this claim invoking <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), is rejected

as frivolous.  There is no record support whatsoever for petitioner's reckless characterization of

_____

[8] Notably, on cross-examination petitioner asked Murphy, "[Are] there any pictures of me and
Mr. Davis together at any time?" and Murphy responded, "if there are, I haven't seen them."

the video as exculpatory.  Further, petitioner should hardly be heard to cry foul in the face of the mileage he derived from the item's absence, which became the centerpiece of his claim of innocence at trial.

3.      **The Suborning of Perjury from Officer Costello (Ground 5 in the Petition)**

As noted, Officer Costello testified at trial that petitioner "tossed" his knapsack when the police first shined a spotlight on him.  Petitioner alleges that this testimony was false because it differs from the account of the same event in the arrest paperwork, where Costello wrote that petitioner "dropped" the knapsack.  Passing over whether the claim is procedurally barred,[9] the Court rejects it as frivolous.  Petitioner confronted Officer Costello on cross-examination with his use of "drop" in the arrest paperwork and Costello offered an explanation, namely, that the words "toss," throw" and "drop" all meant the same thing to him, *i.e.*, that petitioner "let go of the bag."  There has been no misapplication of federal law in the rejection of petitioner's claim because Costello's use of differing verbs does not present a federal question.  Rather, petitioner has once again mischaracterized as perjury what is nothing more than a question of witness credibility, which the jury is presumed to have resolved.[10]  <u>Cavazos</u>, 132 S. Ct. at 3-4.

B.      **The Ineffectiveness Claims**

_____

[9] The specific allegation that Costello testified falsely was not raised on direct appeal appears in petitioner's § 440 application, where it was rejected on procedural grounds as a claim that should have been raised on appeal.

[10] Further, whether petitioner "tossed" or merely "dropped" his bag bears on the reasonableness of his expectation of privacy in the item—and, thus, the lawfulness of the initial search and arrest—but those Fourth Amendment issues are not cognizable here.  <u>Stone v. Powell</u>, 428 U.S. 465 (1976).

1.      **Counsel's Opening Statement (Ground 2 in the Petition)**

Petitioner resurrects here (as he first did in his § 440 motion) his trial complaint that

counsel's opening-statement "concession" that he accompanied Davis to the bank was

prejudicial.   Elaborating at the 440 stage on his trial ruling, Judge Weber rejected the claim, as

follows:

> [c]ounsel advanced an entirely reasonable strategy to admit all aspects of the case
> except the criminal conduct.  In [petitioner's] sworn statement in support of this
> application, [he] acknowledges that he never told defense counsel that he was not
> at the crimes[sic] scene and never discussed whether this fact would be contested
> at trial . . . Defense counsel reasonably chose not to challenge the[ ] facts that
> might easily be disproved with a hotel video or other evidence that would have
> demonstrated that the defense was a lie concocted by either defense counsel or his
> client.  Instead, counsel was prepared to challenge the complainant concerning the
> "true" course of events that took place while [petitioner] and complainant were
> together.

Anderson, slip op., at 2.

Petitioner cannot possibly show that established federal law has been contravened or

misapplied because doing so requires overcoming the double deference that Strickland v.

Washington, 466 U.S. 668 (1984) and Section 2254(d) together require.  See Strickland, 466

U.S. at 690 ("[j]udicial scrutiny of counsel's performance must be highly deferential," and it is

"[petitioner who] must overcome the presumption that, under the circumstances, the challenged

action might be considered sound trial strategy") (internal quotation and citation omitted);

Cullen v. Pinholster, 563  U.S. 170, 190 (2011) ("review of [state court]'s decision is . . . doubly

deferential [because] [w]e take a highly deferential look at counsel's performance [under

Strickland] through the deferential lens of § 2254(d)") (internal quotations and citations omitted).

In short, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were

reasonable.  The question is whether there is any reasonable argument that counsel satisfied

<u>Strickland</u>'s deferential standard." <u>Harrington</u>, 562 U.S. at 105.

The answer is yes, as astutely set forth by the trial court. Petitioner's dissatisfaction with counsel's opening, therefore, is not a basis for habeas relief.[11]

## 2.    Counsel's Pre-trial Investigation (Ground 1 in the Petition)

Returning again to the drop-toss debate, petitioner claims that counsel was ineffective because he was in possession of Costello's arrest paperwork before the start of the suppression hearing but did not review it in time to properly cross-examine Costello on that subject, in that proceeding, where it might have made more of a difference than at trial.[12]  Passing over whether this claim is procedurally barred,[13] the Court denies it on the merits.

Petitioner relies on the fact that the court was somewhat critical of counsel who, on the second day of the hearing, asked to have Costello recalled to address his use of the word "drop" in the arrest paperwork.  Counsel admitted that he was in possession of the paperwork before the hearing but had not been able to review it before his initial cross-examination of the officer.

_____

[11] The 440 court's reliance on state law is not "contrary to" or an "unreasonable application of" <u>Strickland</u>.  <u>See</u> <u>Cummings v. LaValley</u>, 582 F. App'x. 49, 50 (2d Cir. Nov. 7, 2014) (the New York standard "is understood to subsume the federal standard because it is considered more protective of criminal defendants"); <u>Rosario v. Ercole</u>, 601 F.3d 118, 124 (2d Cir.), <u>reh'g</u> <u>en</u> <u>banc</u> <u>denied</u>, 617 F.3d 683 (2d Cir. 2010).

Were it necessary to do so, the Court would also find a lack of prejudice, because petitioner could not show that, but for his the challenged "concession" he would likely have been acquitted.

[12] <u>See</u> <u>generally Kimmelman v. Morrison</u>, 477 U.S. 365 (1986) (restrictions against habeas review of Fourth Amendment claims do not bar ineffective assistance claims premised on counsel's handling of Fourth Amendment issues).

[13] This claim does not appear to have been raised on direct appeal but was presented in petitioner's affidavit in support of his § 440 motion, where it was rejected on procedural grounds.

When denying the request, the court observed that the relevant materials were publicly available documents that counsel could have obtained independent of the prosecution.

Regardless, and without reaching the question of whether it would have been an unreasonable application of <u>Strickland</u> for the state court to have concluded that counsel's challenged conduct did not fall below an objective standard of reasonableness, the Court denies the ineffectiveness claim because petitioner cannot establish prejudice. <u>Strickland</u>, 466 U.S. at 697 ("there is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). There is every reason to believe that, had counsel reviewed the arrest paperwork in time to cross-examine Costello at the hearing about his use in those materials of the word "drop," Costello would have offered essentially the same explanation he gave when cross-examined at trial (*i.e.*, that the words "toss," "throw" and "drop" all meant the same thing to him). There is no reasonable probability, therefore, that the outcome of the suppression hearing or trial would have been different.

**C. The Self-Representation Claim (Ground 6 in the Petition)**

1. <u>Challenge to the Specificity of Court's Advice and Inquiry</u>. Petitioner's principal claim is that in granting his request to represent himself, the court did not explicitly advise him of the specific rights he was waiving and did not make sufficient inquiry into his ability to represent himself. The gravamen of the claim was raised on direct appeal and rejected in a plenary discussion by the Appellate Division:

15

[Petitioner's] contention that the trial court erred in permitting him to represent himself is without merit. To ensure that the defendant's waiver of the right to counsel in favor of self-representation is knowing, voluntary, and intelligent, the trial court must undertake a searching inquiry . . . aimed at insuring that the defendant was aware of the dangers and disadvantages of proceeding without counsel. Contrary to [petitioner's] contentions, his waiver was not ineffective for lack of inquiry into specific factors such as his education or experience in the law. The [New York] Court of Appeals has eschewed application of any rigid formula and endorsed the use of a nonformalistic, flexible inquiry; the whole record, not simply . . . the waiver colloquy must provide a reliable basis for appellate review. Here, the trial court noted the defendant's significant personal experience with the criminal justice system and had numerous opportunities to see and hear the defendant firsthand, and thus, had a general knowledge of defendant's age, literacy and familiarity with the criminal justice system. Further, nothing in the lengthy colloquies in this record calls into question [petitioner's] ability to understand the trial judge's detailed warnings regarding self-representation. Accordingly, the record, as a whole, demonstrates that [petitioner] made a knowing, voluntary, and intelligent decision to waive his right to counsel and to proceed pro so.

Anderson, 94 A.D.3d at 1010-1011 (quotations and citations, all to New York authorities, omitted).

Petitioner's claim fails because the Appellate Divisions conclusions are, factually, a sound assessment of the trial record and, as a legal matter, entirely consistent with applicable Supreme Court holdings on the right to represent oneself at trial and the attendant waiver of the right to the assistance of counsel. See generally Faretta v. California, 422 U.S. 806, 835 (1975) (admonishing that an accused's request to represent himself be "clear[] and unequivocal[]," that his waiver of the right to counsel be "knowingly and intelligently" made, and that he "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open") (internal quotations and citations omitted); Johnson v. Zerbst, 304 U.S. 458, 464 (1938) ("[t]he determination of whether there has been an intelligent waiver of [the] right to counsel must

depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused").

The colloquies between petitioner and Judge Weber on the subject of self-representation speak for themselves: petitioner was unequivocal and adamant in his desire to represent himself in the face of the repeated and unequivocal warnings he was given on the risks of doing so and the numerous opportunities he was afforded to rethink his decision.  Petitioner's specific assertions here, that Judge Weber should have delivered warnings of any greater specificity, or inquired in some more specific way into his capacity to represent himself, find no support in the holdings of the Supreme Court and are therefore not a basis upon which habeas relief could be granted.  See Tovar v. Iowa, 541 U.S. 77, 88 (2004) (reviewing the Court's Faretta jurisprudence and concluding, "We have not . . . prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel. The information a defendant must possess in order to make an intelligent election, our decisions indicate, will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding."); Dallio v. Spitzer, 343 F.3d 553, 555 (2d Cir. 2003) (reviewing Faretta jurisprudence for section 2254(d)(1) purposes, panel majority concludes: "Although explicit warnings as to the dangers and disadvantages of self-representation are certainly advisable to ensure knowing and intelligent waivers of the right to counsel, . . . we conclude that it is not clearly established federal law as determined by the Supreme Court [ ] that such warnings are a constitutionally mandated prerequisite to every knowing and intelligent waiver of the right") (internal citations omitted), cert. denied, 541 U.S.

961 (2004).[14]  See also United States v. Ruiz, 536 U.S. 622, 629 (2002) ("[T]he law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specific detailed* consequences of invoking it.") (emphases in original).

In short, absent his formalistic complaint that Judge Weber should have said or asked something more before granting his request to represent himself, petitioner does not substantively claim—nor could he on this record—that his decision to forgo the assistance of counsel was other than voluntary, knowing and intelligent.  Indeed, petitioner revealed that, for him, the privilege of questioning witnesses was also strategic: *i.e.*, a means for presenting his version of the facts without having to take the stand—a risky course for an individual with his extensive criminal record.  In short, there can be no doubt that petitioner fully understood exactly what he had chosen to do.

2.  Allegations of Disability.  Petitioner also alleges that he suffered from bipolar and antisocial disorders beginning in 2003 (six years before his trial) and that, because of a grievance with the county jail, he did not have access to his prescribed medications during trial and so should not have been allowed to represent himself.

---

[14] As Circuit Judge Raggi's panel majority opinion makes clear, an arguably more "cautionary approach to counsel waivers would certainly be understandable, even laudable, were a district court itself addressing a criminal defendant intent on proceeding *pro se*," but in Dallio, as here, the question is "only whether a state court's contrary ruling falls within the narrow scope of 28 U.S.C. §2254(d)."  343 F.3d at 564.

Passing over whether this branch of petitioner's claim is procedurally barred,[15] the Court rejects it on the merits for lack of proof. It remains a habeas petitioner's burden to establish that he is entitled to habeas relief, <u>see</u>, <u>e.g.</u>, <u>Pinholster</u>, 563 U.S. at 181 ("[t]he petitioner carries the burden of proof"), and petitioner has failed to meet that burden with respect to this branch of his claim. Indeed, but for the allegation made here and in passing in petitioner's 440 affidavit, the record is devoid of *any* indication that petitioner suffered from a mental disorder that disabled him from representing himself at trial. Petitioner was extraordinarily outspoken in his communications with the court and thorough in his cross-examination of witnesses, yet he did not once mention the subject of medication or a possible medical condition. Likewise, based on the absence of any remark on the subject, it appears that neither the court nor standby counsel observed anything in petitioner's behavior triggering the need for health or competency evaluation. To the contrary, the record demonstrates that, for a *pro se* defendant, petitioner performed quite competently throughout the trial, confirming the accuracy of Judge Weber's initial assessment of him as able, articulate and intelligent.

### D.    The Sufficiency Claim (Ground 7 in the Petition)

---

[15] Petitioner's appellate brief makes no reference to a medical diagnosis or medication issue. There is a brief allegation on the subject, however, in his affidavit in support of his 440 motion; under the umbrella of a claim of ineffective assistance of counsel, petitioner alleges that counsel "knew that he was not supposed to represent himself pro se [because] counsel knew that [he] suffered from mental disabilities… but failed to present this information to the court." Petitioner offered no documentation of his medical condition, having submitted only a copy of his notice of intention to file a claim against the county jail for denial of medication. The decision denying 440 relief does not specifically mention the medical allegations but did deny the ineffective assistance claim.

Petitioner's sufficiency challenge, addressed only to the robbery conviction, is premised on minor alleged inconsistencies in the record. For example, he points to the fact that Davis stated in his complaint that he was robbed of all his belongings including his ATM bank card, whereas at trial he admitted that he still had the bank card in his back pocket when he first got into a police vehicle after reporting the robbery. Petitioner also points to the fact that $500 found in his possession at the time of his arrest was not in the denomination of money allegedly stolen from Davis.

Petitioner raised a broad sufficiency challenge on direct appeal, although he did not specifically address the features of Davis's testimony challenged here. Rejecting the claim, the Appellate Division concluded that, "[v]iewing the evidence in the light most favorable to the prosecution . . . we find that it was legally sufficient to establish [petitioner's] guilt beyond a reasonable doubt." Anderson, 94 A.D.3d at 1012. The appellate court was also "satisfied that the verdict of guilt was not against the weight of the evidence." Id.

Under established Supreme Court law, a conviction must stand if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). Cavazos, as noted above, reaffirms Jackson's directive that a reviewing court "must presume" that the jury resolved conflicting inferences in favor of the prosecution and "must defer" to those findings. 132 S. Ct. at 3-4 (quoting Jackson, 443 U.S. at 319).

Applying AEDPA in tandem to the deference that Jackson requires means that petitioner must show that it was objectively unreasonable for the Appellate Division to have concluded that the jury's verdict was not irrational. The evidence marshalled at the outset of this memorandum,

while not overwhelming, unquestionably precludes petitioner from making that extraordinary showing.  The sufficiency challenge, therefore, does not establish a basis for habeas relief.[16]

## CONCLUSION

For the reasons discussed, petitioner James Anderson's application for relief under 28 U.S.C. § 2254 is denied in its entirety.  Further, because Anderson has not "made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), a certificate of appealability will not issue.

SO ORDERED.

Dated: Brooklyn, New York
   December 9, 2015

             /s/ Judge Raymond J. Dearie

             _____
             RAYMOND J. DEARIE
             United States District Judge

---

[16] Petitioner's weight of the evidence claim is not cognizable here.  Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006).